Please the court. I'm Ward Brown I represent the appellants in this case judge. I'm from Liberty, Missouri and I appreciate the opportunity to argue in the Ninth Circuit Court of Appeals again. This case was a case involving the explosion of a mortar shell in a tube that killed one soldier and severely wounded three others. At trial the issue was whether the cause of the explosion was a metal defect or whether the cause of the explosion was a double loading by the soldiers. The issue before you primarily is the 701 issue rule 701 of the Federal Rules of Evidence in that the trial court allowed Phillip Leong to come in and testify as a lay opinion witness with respect to the cause of the explosion. Counsel I want to assume for the purpose of my question that it was erroneous to allow him to testify on the expert issues that he testified to and my question has to do with whether that error was harmful or not and there are a couple of aspects that are of interest to me. One is there were several experts that had been identified three I believe who were not ultimately called as witnesses but could have been and would have supported the same result had this witness been disallowed. The second aspect that is of concern to me is the district courts observation that many of the things that are being complained about were things that the plaintiff elicited through cross-examination herself and I wonder if you could comment on at least at least those two aspects of the harmless error. The first question is the other experts that they identified. One of the experts a guy named Dorico would have come in and presumably testified in accordance with his report that his view was that the cause of the explosion was a double loading. The problem that we have here is that with respect to that witness we got to do the rule 26 vetting process. We got a rule 26 compliant report. We got to take his deposition and he brought with him a stack of materials that would fill this table. Right. All the backup information. We did not get that information with respect to Mr. Leong. Well you deposed him. We did depose him but before his deposition it was made very clear by the Army and by General Dynamics that it was fact only and no opinions or expert testimony would be allowed. Right but I guess what I'm struggling with is had the district court said no he can't testify to this they would have brought in the other person who could. Well. Who would have said the same thing so I guess I'm struggling with that and I'm and I'm struggling I guess there's a third thing I'm struggling with which is had the had there been a do it this witness probably could have been labeled as an expert because of his training and experience and other things. Judge I understand what you're saying on that. I question whether some of this testimony would have come in if we've been allowed to do the rule 26 vetting. I did an on-the-fly cross-examination of him regarding these two completely different tests that he relied on wholly for this purported signature. The one was the rifle loaded. We had a smooth barrel mortar. You drop it in and it spins down in grooves and spins out. For example that's something that I found out during trial. With respect to the other experts what they relied on to get to their opinion wasn't the same thing as best I could tell as what Mr. Leong is relying on for his opinion. I was fully ready to attack Mr. Dorico and there's a reason why they didn't call him. There's a really good reason why they didn't call him. There was also I believe there were also medical witnesses who had been listed as non-retained experts and I presume it's because of the patients coming in and saying there were two rounds that exploded on the ground and other similar statements. I believe they were listed in their disclosures because of their medical treatment and because of their medical records. Right but some of their records also supported the defense theory. The one thing that they put in their brief was something that was never mentioned at trial. The one and we believe the reason it wasn't mentioned in trial with all due respect to everybody it was such a ridiculous point. It was buried in the medical records. Mr. Riggins was brought to the medical center unconscious. He had been intubated hadn't he? But it certainly didn't come from Mr. Riggins and it's not even the theory that they espoused at trial. It says that there were two shells on the ground that blew up. There's no question that's not what happened here. There was a shell that was put in. It blew up in the tube. Nothing blew up on the ground. So I don't know where that came from. It certainly didn't come from Mr. Riggins. And no doctor testified to that at trial. And the first time we ever heard of them focusing on this was on this appeal. It was never talked about in front of the jury because we would have had a very strong response which is what we put in our brief. It didn't come from us. Counsel, I'd like to follow up on Judge Graber's question and then your point that I think what you're saying in response to her is that you have your prejudice because of the failure to give you the Rule 26 protections, if I can speak in shorthand. And there's a colloquy at trial at 609 and 610 that seems to suggest that you, I think there's a bit of dispute at trial anyway, about whether you received the backup data that Mr. Long relied upon to testify that there had been other substantially similar explosions and about his work assessing that data. So my question, if you'll forgive my lengthy prelude, is whether you had that data. We did not. And the data that I'm talking about is the data with respect to the tests that he says he relied on, the purely expert type of opinion, other tests that purportedly happened out there in the world. We did not have those materials. We had some materials from Dorico that he had produced that I believe weren't those materials that you're talking about. That was the most important thing because that's what really supported his theory, at least at trial, that we learned of regarding this purported signature. We think there are lots of problems with his methodology and what he did, but we didn't have a chance to, you know, the judge said none of this is coming in before trial. And there was a 706 motion filed right before trial to have the court name him as an expert. In hindsight, I wish the judge had granted that motion because then I could have said, okay, based on the things that the district court found for denying the motion, that we were prejudiced, that we didn't have Rule 26 materials, that we might need to go out and get another expert, that we needed to fully vet this and it's unfair to us. Those are the things that the district court talked about in denying their 706 motion, that they listed all the things that were purely expert testimony in the motion. It's on my brief, I think, page 13. There's a paragraph right out. It came out of their mouths, not ours. To answer your question, we did not have everything. We had some things. There were some things we had through DeRico, the other guy. And I just happened to be able to figure out, well, I think maybe this is what he's talking about. But, you know, our guard was down because she said he would not be allowed to talk about any opinions or conclusions of that nature, the cause of the explosion, okay. He was limited to 701 and nothing else. And, you know, the rule is there for a reason. Rule 26 is there so that trial by ambush of this nature doesn't happen. What is your response to the district court's reasoning that much of the testimony that you were concerned about was testimony that you elicited rather than that was elicited on direct? I respectfully disagree with the trial court on that, Judge. Do you disagree that it happened or do you disagree that it makes a difference? I don't think it makes a difference because I think we're entitled to try to put our shield up to do whatever we can do fighting by the seat of our pants during trial when something new comes in like this. So I don't think I should be faulted for trying to do that. But with that said, the things we're complaining about are in the table at the back of my brief. Those are things that I asked. Those are things that came in on direct examination over repeated objections. That's another thing that was terrible here. I had to stand up the whole time. And that puts somebody in a very difficult position. You said stand up the whole time. To object to the judge's ruling. Repeatedly object in front of the jury. Is that what I'm understanding you mean? Yes, Judge. And that put me in a very difficult position because I had to stand up and look like, you know, and it wasn't fair to my client that this information was coming in. And the judge followed her rulings pretty much through a lot of the first day of the testimony. She drew that line, no, you can't talk about causation. Then for some day, some reason on the second day, all of it came in. It just came in. And there was never an explanation for why it actually came in. So I want to get back to the question I think you asked originally about the prejudice and the fact that another witness might have come in and supported this. Somebody that were fully ready to cross-exam. Somebody that we had all of the vetting done. That is completely different than what happened here. And I would take my chances with that. I think that is a big difference. And to speculate and say some guy would have come in and he would have said this and therefore you're not prejudiced, I don't think that's correct at all. And why? They called one witness. We had a three-week trial on the very last days when all this happened. I would describe the rug which jerked out from under us. And then they sit down and they called no other witness in the case. And the prejudice of that and the fact that it's not harmless is quite evident if you look at the closing argument that was given by, and we cited in our brief, the closing argument where they talk about him being the go-to guy, that he does this around the world on and on and on. Okay? Can I ask two other questions? Sure. I think that Mr. Leong testified that he tried to recreate this in-bore explosion with a double load and he tried 50 times and couldn't get it to respond the same way I'm summarizing, of course. Did you have access to that data about those 50 tests? We did. Actually, those tests were about he took this lot of shells in this case and tried to recreate the double loading incident. And he did it several times. It wasn't 50, but it was several. And never got it to blow up in the tube. And his explanation was the reason I stopped is because I didn't want to blow up the tube. Okay? It made no sense to us. So every time when he double loaded, they successfully shot out of the tube. Okay. So you had that data? We had that data. Okay. Then I'm a little bit confused about another part of the transcript that says he investigated only two other in-bore explosions in his career. And he describes the size of the mortars and they're somewhat different. And my question is, of course, going to the substantial similarity, are those two in-bore explosions prior, in-bore explosions that had happened in the field, different from the other data that he testified where he said there had been many, many other explosions? Yes. There's two different things here. One group of tests is the test with this lot of shells that we dealt with here. That he did for this litigation. For this litigation. None of those blew up in the tube. Okay. The one involving the 4.2 millimeter that spins down, the rifle loaded, and the other one, those were something else that we did not have. We did not have those documents, those tests. And remember, even some of these tests, there's a little information. There might be a report, but there's backup to these tests. It is a voluminous amount of information. Okay. Just back up if you could. The 4.2, the two prior accidents, those were not done for this litigation. They were not. Investigations about other explosions that had happened. Based on what he said at trial, yes. Okay. And you didn't have those? We did not have those. Were those mortars the same size as this one? One was not. It was a 4.2. Okay. The other one, I believe, was the same size, but the differences were that it was cast iron, British mortar system instead of a forged steel like ours. It had a completely different charging system, a different firing mechanism. Okay. You've answered my question. I get it. Now, just to, not to belabor the point, but are those two batches of data different than this third batch of data that he talked about in his deposition that you had the colloquy at trial where you said we weren't given access to that data? Yes. Thank you. That's a different thing. I see I have two minutes left, and I'd like to reserve that for everybody. You may do that. Thank you, Judge. Good morning. May it please the Court. Petter Battaldon on behalf of General Dynamics. We're not at all conceding that there was an error under Rule 701, but I would like to begin by answering Judge Graber's question about the harmless error point involving expert testimony. There are, I think, two separate answers to your question. The first you got into with my friend, Mr. Brown, which is that if Leong had not been permitted to testify, General Dynamics would have called its own retained experts, and the jury would have heard much the same story. So there's no reason to believe that any error was prejudicial. But doesn't that require us to speculate about what those experts would have said and the extent to which they would have been able to cross-examine those experts successfully? Well, we know what those experts would have testified to because they were deposed. In fact, in this Court's own prior opinion in the case, it explained that they were going to testify that this was a double-loading event. So we know that they would have reached the same conclusion that Leong reached. But there's a second reason why there's no prejudicial error in this respect, and that is that if the district judge had changed her ruling once Leong gets on the stand and she's hearing the testimony and the Court says, you know, I really think this is over the line, this is not 701 testimony, it's really 702 testimony, at that point General Dynamics would have renewed its request to allow Leong to testify as an expert under Rule 706. The district court had denied that motion before trial because it didn't make any difference. He was going to be there under 701. The fact he could have worn another hat didn't make any difference. But if the district judge had changed her view and determined that she could not, he could not have testified as a Rule 701 witness, then she would have been able to accommodate Leong's testimony as a Rule 706 witness. There is at least one case from our circuit that seems to say that one can kind of view harmlessness in that way. The Figueroa Lopez case in which it was quite a different sort of testimony about drug trafficking, but the analysis was that, well, this person could have been qualified as an expert and it's difficult to see how anything would have come out differently given how much was already known about that witness and their testimony. I guess in this particular case, the evidence is more complicated, it seems to me, than it was in Figueroa. What's your response to opposing counsel's argument that the procedural protections, getting more data, giving time to get their own additional expert, would have kicked in and made a difference? Your Honor, it would not have made a difference because what the plaintiffs received in this case from Leong before trial, in terms of disclosure and discovery, is not materially different than what they would have received if Leong could have been called as a retained expert. Leong produced a written investigative report for the Army, that's the RDAC report. That is, in all material respects, the same thing that a retained expert would have produced in a case like this. Well, if they had really complied with Rule 26, then he would have had to disclose all the data he relied upon, and opposing counsel tells me he didn't. Do you agree? I think it's fair to say that not all of the backup data was disclosed, but there was no impediment to the plaintiffs asking for that data. Well, except they didn't know they had to because this was going to be a fact witness, not an expert witness, right? He wasn't going to be allowed, presumably, to go into this very technical area. I think that would be their response. Well, in fact, at his deposition, with an Army lawyer present, Leong gave opinion testimony, and the Army didn't intercede or prevent that. Well, those plaintiffs objected. They did object, but as the district court pointed out, I think more than once, plaintiffs had no reason to believe that the Army would allow Leong to offer opinions at deposition and then not allow him to offer opinions at trial. Well, the judge had said he wasn't going to be allowed to testify as an expert counsel. Isn't that a pretty good reason? Not at that point. Not at the point that the deposition was taken, Your Honor. There had been no ruling at that point about whether Leong would be an expert. Yes, but to my point, they were objecting that he was offering expert opinion, and the Army had only permitted him to offer fact opinion at that point. In answer to your question, Your Honor, the Army had only allowed Leong to testify as a Rule 701 witness. Right. But that doesn't mean he can't offer opinions. A 701 witness... But not expert opinion counsel, and that's what I'm getting at. That's right. That's right. And a Rule 701 witness may offer lay opinions, and our position here is that these were appropriate lay opinions. Let's get back to the earlier piece about what would have been different. There would have been presumably disclosure of additional backup data. Is there anything else in your view that would have been different had he been declared an expert? Well, I think the only other thing that would have been different is actually something that's harmful to the plaintiffs, and that is that because Leong was not a retained expert and was not under the control of either party, he was available to both sides. The plaintiffs were free to interview him, and if they did depose him, they were free to talk to him at any time they wanted about the subjects of his testimony, and they did not avail themselves of that opportunity. General Dynamics did, but the plaintiffs didn't. Had he been a retained expert, he would have been off-limits, so to speak, in that respect. So that actually cuts against the plaintiffs. The other harmless error point I want to emphasize is that the physical evidence here was very strong. It suggested that there had been a double-loading event. You had an explosion that was a low-order detonation, and it occurred in the upper portion of the gun tube, and plaintiffs' own expert, Nixon, testified that there are studies indicating those are characteristic features of a double-loading event. Now, contrast that with the very common sense point that we made that undercuts the plaintiffs' theory, that there was a defect. These cartridges are being produced on a mass basis, on an assembly-line production scale. If we're to believe that there was such a catastrophic error in that process at some point along the way, so significant that it compromised the viability of one of the cartridges, you would expect to see that defect playing out repeatedly in a range of shells before the manufacturing process is brought back into compliance. But, in fact, this is the only shell that has ever had even the hint of a reported problem. None of the other cartridges in this lot of nearly 13,000 shells has ever had a reported problem, nor have there been any reported problems in either of the sister lots produced before or after this lot. Now we're talking north of 45,000 shells. There's never been another reported problem. And in that circumstance, it's just not believable that a manufacturing defect would have been the cause of the error. So you have substantial physical evidence that plaintiffs' own expert acknowledged was indicative of double-loading. What's your response to the question opposing counsel's point that Rule 26 is intended to prevent trial by ambush? I think that's absolutely what Rule 26 is intended to accomplish. And I think there was no ambush here, because on the most critical opinion that Leong offered, which is about the signature characteristic of this explosion, he gave that opinion in his ARDEC report, he gave that opinion at his deposition, and then he gave it at trial. There's no surprise. Wouldn't you agree, counsel, that his testimony got a whole lot more definite at trial than it was at deposition? He was much more equivocal, by my read, in his deposition. I think that's right. And the way that Leong explained that and the way that Lt. Col. Morris, who was the Army colonel who came to the trial and actually took the stand at one point to explain to the district court the Army's position, the way they explained that is in order to identify a cause of an explosion for Army investigative purposes, they have to have a certain level of certainty or confidence in that result. But it's something like a 95% level of certainty. Sort of like beyond a reasonable doubt versus preponderance of the evidence. I think that's a good explanation, Your Honor. But that's obviously not the standard that applies in civil litigation. And so when Leong is being asked on the stand in civil litigation what the cause is, he's not similarly hampered by that very stringent standard that he faces in producing his investigative report for the Army. So all of those are reasons why no error here was harmless. But I also want to emphasize that there was no error in the first place. The rule that we are advocating is rooted in the advisory committee comments in 2000 when Rule 701C was added. And what those advisory committee comments show is that if a witness is testifying based on an investigation that he has performed, that's not done in anticipation of litigation, then those opinions can be offered as a lay witness. That's the only way to understand the advisory committee comment about the businessman who can testify about the value of the business and the projected profit stream from the business. Because that businessman, when he takes the stand, his testimony is going to be grounded in technical expertise. It's going to be based on financial, accounting, and other background information that we would think of as being something an expert offers. But the advisory committee said, no, that's proper lay opinion because of his position. He has particularized knowledge because of his position in the business. Well, that's Leon. He has particularized knowledge because of his job. This is simply what he does. He investigates accidents. Well, that seems somehow different because that's like saying, well, it's the doctor's job to treat patients, and therefore what the doctor says isn't really expert testimony because it's his job. I'm not sure just saying it's his job is a full answer. In fact, Your Honor, I think the doctor example is exactly what happens with treating physicians who are allowed to testify without being called as Rule 702 experts to explain their diagnosis. Now, they can't go beyond that, of course, but they're free to get on the stand, use their medical expertise, which obviously involves a significant amount of training and background, and they're allowed to explain the diagnosis that they reach. But they're not allowed to go into other research that they've done on this disease and so forth and sort of like the previous events in this case. They wouldn't normally be allowed to go into, you know, I've written a book about this disease. But, Your Honor, I think the appropriate analogy happens earlier in the chronology of what you said. When the doctor takes the stand to describe the diagnosis that he or she made based on seeing the patient, what goes into that very process of diagnosing the patient is a wealth of background, expertise, knowledge, and training garnered in medical school, residency, and so forth. That itself would require what you would ordinarily think of as expertise. If we apply that, then every accident reconstructionist who's coming in who wasn't a recipient witness to anything would be allowed to come in under 701. And the commentary that you've recited, the 2000 Amendment, is really clear that that's not what the rule is. Well, I disagree, Your Honor, because there's one important limiting feature that makes the rule that we're advocating exceptionally narrow and unlikely to apply in many circumstances at all. And that is that the prior investigation must have happened independent of or not in anticipation of litigation. In all the drug cases, which is the typical scenario that we have in this area where courts are drawing lines between 701 and 702, the government agent, the DEA agent, the police officer who's taking the stand and is giving an opinion, was the one who built the case for one of the parties to litigation, who built the indictment and the prosecution on which it was based. That's like a retained expert. They're essentially giving an opinion that's grounded in their work for one of the parties. Leong is completely different because he's required by law, by Army regulation, to go out and investigate any mortar accident or ammunition accident that happens anywhere in the world involving U.S. Army ammunition. He has no stake, and the Army has no stake in the outcome of that investigation. He's required to perform it. And it's just like the businessman in that respect. The businessman is not allowed to give, or is rather, allowed to give testimony about the value of the business because he hasn't obtained those or created those opinions in anticipation of litigation. He has to run a business. He knows that by virtue of his job. Same thing with Leong. He knows what he knows. He investigated what he investigated, and he's allowed to testify about what he did. So any accident reconstructionist whose job is to be an accident reconstructionist should be allowed to be called as a 701 witness? Only if they were required by law or contract or for some other reason to conduct that accident reconstruction independent of the litigation. And that's almost never going to be the case, Your Honor, because these are almost always retained experts who have no past familiarity with the case. What if the accident reconstruction expert was actually a witness to the accident and is called then as a witness? Can he then offer his opinion based on his background as well as to what caused the accident? I think that's a closer case, Your Honor, but I don't think that would be permissible 701 testimony if that accident reconstructionist was not required to prepare a report or to investigate independent of or not in anticipation of a litigation. That's the key feature. Because Leong is not called in to sort of pick up the pieces here because you just happen to be on site, because you just happen to be a bright guy who was available. Clearly he was brought in because he was an expert in the Army's eyes. It's no accident that he's brought in, and yet he is allowed to testify on everything that he saw and everything that he concluded and all the tests that he ran. And he ran those tests precisely because in the Army's view he was the expert. I think that's right, Your Honor, and I think there's no material difference between that example, what you've just described Leong doing, and the business owner who gets on the stand and is informed by his background, technical expertise in financial and accounting issues and is nonetheless allowed to testify as a lay witness about what the profits of the business were and would be and what the value of the business was. In that case, the business owner is the owner of the business as opposed to the owner of some other business who's being brought in to say, gee, this is how I view this business, right? That's right. Okay, but here you have somebody who, again, is a direct witness in the first instance to everything that's going on. That's right. Just like Leong personally investigated this accident and is a recipient witness to his investigation. Right, but unlike the hypothetical that I gave you, it wasn't that he just happened to be vacationing in Hawaii when the ordinance went off and happened to be on site and ran over and said, holy Toledo, what a coincidence. I'm an ordinance expert from Alabama and just happened to be vacationing here. Let me take a look. That's true, and again, I think the most important feature, the differentiating feature between our case and the other cases that have not allowed this test 20 under 701 is that the investigation was not conducted in anticipation of litigation. Just like the business owner knows his business, not in anticipation of litigation. The business owner has particularized knowledge because he happens to own the business. Mr. Leong didn't have any of that, but he was testifying about very technical data about the meaning of a Chevron mark on the side of a mortar shell. Doesn't that change this pretty significantly? May I answer? Yes, please. It doesn't change it because the fact that a lay witness has certain expertise doesn't make his testimony excludable under 701. If that were the case, the business owner couldn't testify because his testimony about the value of the business is rooted in financial and accounting expertise. So we know that can't be the answer. That's not what the advisory committee intended. Do we look to the witness, or do we look to the nature of the testimony the witness is giving? I don't know that you can separate the two, Your Honor. Doesn't the commentary separate the two? Well, I think the commentary focuses both on the witness who is giving the testimony and also the contents of the testimony itself. I don't know that they're separable. We ask the court to affirm. Thank you. Thank you. I want to respond to specifically some of the comments. First of all, under the 706 motion, remember that the trial court found it was too late. We would be severely prejudiced if this were allowed to happen, all this expert stuff come in at the last minute. So that's why when she denied that motion, she said in her order that it's too late, there would be prejudice, all those things. I thought that was what the magistrate ruled when he denied the motion to add a fourth expert. The magistrate did that, yes, and Judge Mulway did so as well with respect to this motion. Regarding whether we asked for it, there was a full subpoena to Mr. Leong before his deposition. Asked him for anything whatsoever, the most broad subpoena that you could think of was sent to him. There were all kinds of things he didn't bring, and that's another reason why we were prejudiced because he didn't bring it, and then he brings it to trial. His opinions changed. His opinions in his deposition in his report was it's inconclusive. His opinion was it could be a metal defect. At trial, it's conclusively a double load. There's no way it's a metal defect. This rogue shell thing, my opponent said that the number of shells out there tell you that this had to be a double load because it didn't happen to any other shell. Their own expert, Zakharovsky, when he put his deposition in, said there are rogue shells all the time. That's how it usually happens. We put that in the record, that there will be one shell that's just not manufactured right, and it has a little hole in it, and it blows up in the tube. The 95% certainty thing, I completely disagree with their reading of the record on that. If you have a question, I would ask that you read the record because that's not what I believe the record says. What is your response to the argument that there's considerable physical evidence of double loading, including some concessions by expert Nixon? What Mr. Nixon conceded was that double loading is one of the four things that can happen in a low-order detonation like this. He also said there is a study, there is one study that seemed to indicate that it blows up sometimes in the upper part of the tube. He also said that it sometimes blows up in the middle part of the tube as well, which is what we believe. If you look at this tube, it's not the very top. It's kind of towards the middle, the middle to upper part. We're getting the semantics there perhaps. For their theory to be right, their theory is that the last shell of the morning mission didn't fire. Nobody noticed. Nobody swabbed it. We take a 90-minute lunch break. We come back. Nobody swabs it again. Nobody downrange notices that the shell didn't fire. The first shell of the afternoon, you put it in and it blows up because there was a shell in there before is their theory. The other evidence is that the last shell of the morning mission was a white phosphor shell. It wasn't even an HE shell. It would have been a fireball. There is abundant evidence on our side of that equation, Judge, to answer your question. To answer your question, I think I'll be quiet now. Thank you very much. Thank you. We appreciate the arguments of both counsel. It's been extremely helpful. The case is submitted.
judges: Graber, Bybee, Christen